Scott Florer, Pro-Se

U.S. COURTS

OCT 26 2022

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

# UNITED STATES DISTRICT COURT IN THE

# SOUTHERN DISTRICT OF IDAHO

D. SCOTT FLORER

v

FORD MOTOR SERVICE COMPANY INC;

LITHIA MOTORS SUPPORT SERVICES

INC; JAMES D. FARLEY JR; LISA DRAKE;

BRYAN DEBOER; CHRIS HOLTZSHU;

RHETT SHEEDER; RICH STUART;

ANGELO SANCHEZ; TRAVIS

STEAR; LISA CRABTREE SUED IN

THEIR INDIVIDUAL AND OFFICIAL

CAPACITIES

CASE NO. 1:22-CV-00449-DKG

MAGNASON-MOSS WARRENTY ACT

15 U.S.C. CH. 50 SEC. 2310 (d)(1)

CONSUMER COMPLAINT FOR

BREACH OF WARRANTY

## I. VENUE AND JURISDICTION

28 U.S.C. 1391 Venue Generally

28 U.S.C. 1331 Federal Question Jurisdiction

28 U.S.C. 1332 Diversity Jurisdiction

28 U.S.C. 1367 Supplemental Jurisdiction

complaint  1 of 19

15 U.S.C. 2310(d)(1)

AMOUNT IN CONTROVERSY $560,000.00

## II. PARTIES

1. Defendant Ford Motor Service Company (FMC) is incorporated under the laws of the State of Delaware and Idaho as a Foreign Corp., and its principle place of business is 1 American Road Dearborn MI 48126. Who's Agent of record in the State of Delaware is The Corporation Trust Co. at Corporate Trust Ctr. 1209 Orange St. Wilmington New Castle DE 19801 and 921 S. Orchard St. Ste. G Boise ID 83705.

2. Defendant James D. Farley is the President and CEO of FMC who's principle place of business is the State of DE. Who's Agent of record is The Corporate Trust Co. at 1209 Orange St. Wilmington New Castle DE 19801 and 921 S. Orchard St. Ste. G Boise ID 83705.

3. Defendant Lisa Drake is the COO of North America Operations for FMC who's principle place of business is the State of DE. Who's Agent of Record is The Corporate Trust Co. at 1209 Orange St. Wilmington New Castle DE 19801 and 921 S. Orchard St. Ste. G Boise ID 83705.

4. Defendant Lithia Motors Support Services Inc. (LMC) is an Authorized FMC Dealer and is incorporated under the laws of the State of Oregon and Idaho as a Foreign Corp., and its principle place of business is 150 N. Bartlett St. Medford OR 97501. Who's Agent of record in the State of Oregon is National Registered Agents Inc. at 780 Commercial St. SE Ste. 100 Salem OR 97301 and 921 S. Orchard St. Ste. G Boise ID 83705.

5. Dft Bryan B. DeBoer is the President of LMC who's principle place of business is the State of OR who's mailing address is 150 N Bartlett St. Medford OR 97501. Who's Agent of record is National Registered Agents Inc. at 780 Commercial St. SE Ste. 100 Salem OR 93701.

6. Dft Chris Holtzshu is the Secretary of LMC who's principle place of business is the State of OR who's mailing address is 150 N Bartlett St. Medford OR 97501. Who's Agent of record is National Registered Agents Inc. at 780 Commercial St. SE Ste 100 Salem OR 93701.

7. Defendant Lisa Crabtree is the Ford Service Advisor at LMC Ford 8853 W Fairview Av. Boise ID 83704. Who's Agent of Record is National Registered Agents Inc. at 921 S Orchard St. Ste G Boise ID 83705.

8. Defendant Rich Stuart is the Ford Shop Foreman at LMC Ford 8853 W Fairview Av. Boise ID 83704. Who's Agent of Record is National Registered Agents Inc. at 921 S Orchard St. Ste G Boise ID 83705.

9. Defendant Travis Stear is the Ford Shop Foreman at LMC Ford 8853 W Fairview Av. Boise ID 83704. Who's Agent of Record is National Registered Agents Inc. at 921 S Orchard St. Ste G Boise ID 83705.

10. Defendant Angelo Sanchez is the Ford Service Technician at LMC Ford 8853 W Fairview Av. Boise ID 83704. Who's Agent of Record is National Registered Agents Inc. at 921 S Orchard St. Ste G Boise ID 83705.

11. Defendant Rhett Sheeder is the Ford Service Director at LMC Ford at 8853 W Fairview Av. Boise ID 83704. Who's Agent of Record is National Registered Agents Inc. at 921 S Orchard St. Ste G Boise ID 93705.

12. Plaintiff D. Scott Florer in 2013 was employed at Kona Machine & Service as a Machinist Assistant working on Chevrolet, Ford, and Dodge engines by honing the block, polishing cranks and valves, reassembling the blocks by installing the crank, main bearings, connecting rods, pistons, rings, cam, heads, etc. (See, Exhibit 1, Florer Decl. p. 1).

13. In 2013 Florer was employed at Bolton Inc. a Civil General Contractor as a mechanic/yard dog servicing, preventive maintenance, and repairs on Yellow Iron (Heavy Diesel Equipment), heavy, medium and light duty trucks as well as organize and maintain the shop and yard (Id.).

14. In 2014 Florer was employed at Mobotech LLC. an automotive repair shop as a mechanic working on domestic and foreign autos (Id.).

### III. FACTS

#### A. PRE-SALE AND SALE

1. Plaintiff Florer owns a 2013 F150 XLT 4x4 with a Gen. 1 Coyote 5.0 engine with 185,000 miles in July of 2020, that had developed an engine piston knock and metal pieces in the oil filter (Id. Exh. 1, p. 1).

2. Defendant FMC is a global auto company incorporated in the States of Delaware and Idaho (Id.).

3. Defendant FMC designs, develops, manufactures, seller, distributer in intrastate commerce, and warranter of the Gen. I to Gen. III 5.0 Coyote Remanufactured engines (Id.).

4. Defendant LMC is an Authorized Dealer for FMC in autos, auto parts, and remanufactured auto parts in the Western U.S. (Id.).

5. Defendant LMC is a seller, installer, and warranter of FMC Remanufactured engines (Id.).

6. FMC trained LMC Defendant's Sanchez (Ford Auto Technician), Stuart and Spears (Ford Shop Foreman), Sheeder (Ford Service Director), Crabtree by providing diagnostic software with training to use the ford software, training in auto shop equipment and all repairs for all FMC autos including the F150, training in pre-sale and sale disclosures and warranty issues (Id.).

7. Plaintiff Florer contacted Defendant LMC Ford of Boise ID on July 14th, 2020 for an estimate to replace the original Gen. I 5.0 Coyote engine with a new Gen. III 5.0 Coyote engine in his F150 (Exhibit 1, p. 2).

8. LMC Ford Service Advisor Trish Feigal responded on July 15th, 2020 that a new FMC 5.0 Remanufactured engine with a 3-year unlimited miles warranty and new water pump (recommended by Ford) is $9,718.77 parts and labor (Id. p. 2).

9. Plaintiff Florer contacted LMC's Feigal on August 4th, 2020 whom *turned over* the Consumer to LMC Ford of Boise Ford Service Advisor Defendant Lisa Crabtree whom repeated Feigal (Id. p. 2).

10. On August 7$^{th,}$ 2020 Pltf brought the F150 to LMC Ford Service Advisor Dft Crabtree (Id. p. 2).

11. On August 7th, 2020 Florer paid LMC Crabtree $7,000.00 down for the 5.0 Coyote engine replacement and left the F150 with Crabtree (Id. p. 2).

12. On August 7th, 2020 the Consumer Florer asked the Warranter LMC Crabtree for "the Terms and Conditions in writing of the new engine warranty" (Id. p. 2).

13. On August 7th, 2020 Crabtree responded "there isn't any, 3-year unlimited, that's it" (Id. p. 2).

14. That same day the Consumer Florer than asked the Warranter and FMC's Authorized representative Crabtree for that information, "3-year unlimited miles Terms and Conditions" (Id. p. 2).

15. That same day Crabtree replied "Not till were done, than you get your paperwork, it's all on there" (Id. p. 2).

16. That same day Florer asked Crabtree to "replace both (upper and lower) radiator hoses, the serpentine belts, and the recommended by Ford water pump" (Id. p. 2).

17. That same day Crabtree responded "we will replace the water pump and serpentine belts, we will only replace the radiator hoses if they need replaced, we will inspect the intake, fuel injectors, hoses, clamps and we will only replace what needs replaced" (Id. p. 2).

18. On August 14th, 2020 Florer went to LMC Ford Boise and paid Crabtree $1,000.00 to be applied to the engine replacement (Id. p. 2).

19. On August 14th, 2020 Florer noted a crate next to his F150 with a printed label reading, "5.0 4V Long Block Remanufactured dated July 6th, 2020" and a Serial No. (Id. p. 2).

20. On August 31st, 2020 LMC Crabtree contacted Florer to say that the F150 is ready for pick up (Id. p. 2). This Invoice No. 933823 dated 08/31/20 shows mileage out at 185,568 (Id).

21. That same day Florer went to LMC and paid Crabtree $1,925.21 the remaining balance for the engine replacement (Id.).

22. That same day Florer started the F150, the engine light was on, Florer informed Crabtree and then Dft Sanchez, the Ford installation technician that removed and replaced the engines, said to Florer that it is emissions only (Id. p. 3).

23. That same day Florer noticed a tick noise, barley hearable, coming from the Gen. III 5.0 Coyote Remanufactured engine (Id. p. 3).

24. That same day Crabtree provided Florer with LMC Ford Invoice No. 933823, pointed at the document and stated "This is the warranty, 3-years or 50,000 miles, that's all there is" (Id. p. 2).

25. That same day Florer asked Crabtree about other needed parts such as, "both radiator hoses?" (Id. p. 2).

26. That same day Crabtree responded that, "We only needed to replace the upper radiator hose and some plastic pieces that go with it, the lower radiator hose is fine, the intake is fine, the fuel injectors are ok, we put on new serpentine belts and new water pump" (Id. p. 3).

27. That same day Defendant Sheeder LMC Service Director stated to Florer that, "There are not any terms of the warranty it's on your invoice, all you need to do is change the oil every 5,000 miles" (Id. p. 3).

28. No other warranty information had been disclosed by LMC Ford Boise nor Ford (Id. p. 3).

29. On August 31st, 2020 the Consumer noted that no disclosures of any warranty information posted at LMC in the Service nor Parts areas (Id. p. 3).

## B. FIRST OPPORTUNITY BY WARRANTERS

30. On September 29th, 2020 or said another way, twenty-eight (28) days/2,400 miles since the installation of the consumer product, while driving on I-84 at 80 mph the engine failed and sounds began coming from the dash board and the F150 lost power, Florer immediately pulled over, the dash board temperature gauge was in the red (Id. p. 3).

31. On September 29th, 2020 Florer phoned LMC and informed Crabtree of the aforesaid in Pgh. No. 30, above (Id. p. 3).

32. On September 29th, 2020 LMC Crabtree responded, "Take it to Payette Ford" (Id. p. 3).

33. On September 29th, 2020 Florer replied, "You installed it." (Id. p. 3).

34. On September 29th, 2020 Crabtree stated, "The tow bill will be $400.00 your cost" (Id. p. 3).

35. On September 29th, 2020 Florer than looked under the hood of the F150 and informed Crabtree that "The lower radiator hose is not connected to the radiator" and sent pictures via phone text to LMC Boise Crabtree (Id. p. 3).

36. On September 29th, 2020 upon viewing the pictures, Crabtree stated "That may not be warranty covered, the clamp broke, you will need pay the tow bill" (Id. p. 3).

37. On September 29, 2020 Crabtree than retrieved Defendant Rhett Sheeder LMC Ford Service Director to the phone (Id. p. 3).

38. On September 29th, 2020 Sheeder stated, "You can fix it, I'll tell you how, X gauge wire, put the hose back on, use the wire to hold it on, bring it in when you can, no hurry, will look at it when you bring it in" (Id. p. 3).

39. On September 29th, 2020 Florer asked Sheeder to send via phone text a picture of the missing lower radiator hose clamp (Id. p. 3).

40. On September 29th, 2020 LMC Sheeder sent via phone text a picture of the missing clamp (Id. p. 3).

41. On September 29th, 2020 Florer asked Crabtree to order a new lower radiator hose and that Florer will apply Sheeder's fix with a piece of wire and bring it in (Id. p. 3).

42. On September 29th, 2020 Crabtree responded that, "I will order you a new lower radiator hose, we cannot diagnose it for two weeks, it will just sit here, you talked to the Service Director, he told you how to fix it until we can get it in the shop in a couple of weeks" (Id. p. 4).

43. On September 29th, 2020 Florer purchased anti-freeze, however, wire was not available (Id. p. 4).

44. On September 30th, 2020 Florer purchased the wire, shaped it similar to the clamp in the picture received from Sheeder of the actual clamp, put the lower radiator hose back on the radiator, the shaped wire clamp (than gorilla tape around the Sheeder fix), filled the radiator with anti-freeze and water, started the F150 and the check engine light is on (Id. p. 4).

45. On September 30th, 2020 Florer went to LMC Ford Boise, paid for and picked up the new lower radiator hose (Id. p. 4).

46. On September 30th, 2020 at LMC Florer informed Crabtree that the check engine light is on (Id. p. 4).

47. On September 30th, 2020 Crabtree responded, "We cannot look at it today, we cannot get it into the shop for two weeks" (Id. p. 4).

48. That same day, The Consumer Florer insisted that the Consumer Product be scanned by the Warranters for Diagnostic Trouble Codes (Id. p. 4).

49. That same day, Crabtree replied that, "we can do that, bring it in Friday on October 2nd and we'll have a Tech. scan it" (Id. p. 4).

50. On October 1st, 2020 Florer purchased more anti-freeze and changed the original lower radiator hose for the new lower radiator hose, filled the radiator with anti-freeze and water (Id. p. 4).

51. On October 2nd, 2020 Florer brought the Consumer Product to the Warranters and was greeted by Defendant's Stuart (Ford Shop Foreman) and Sheeder (Ford Service Director), Florer complained of the tick noise coming from the Remanufactured engine that was barley hearable when picked up after the installation and has become significantly louder as well as the lower radiator hose coming off (Id. p. 4).

52. On October 2nd, 2020 Dft's Rich Stuart and Rhett Sheeder connected the Ford Diagnostic Trouble Code (DTC) Scanner to the F150 Power Control Module (PCM) (Id. p.4).

53. On October 2nd, 2020 the F150 DTCs are: (i) DTC P0015 B Camshaft Position Timing Over-Advanced (ii) DTC 1285 Cylinder Head Overtempt and (iii) DTC 1299 Limp Mode (Id. p. 4).

54. On October 2nd, 2020 Sheeder stated, "It's ok to drive, well schedule an appointment to get it in" (Id. p. 4).

55. On October 2nd, 2020 Stuart and Sheeder made an appointment for October 6th, 2020 at 7:30am (Id. p. 4).

56. On October 6th, 2020 7:30am at LMC Florer brought the F150 and complained to Crabtree and Sheeder of: (a) A bracket in the rear of Bank 1 (left side rear of the engine) flopping around and hanging by one out of two bolts; (b) The failure of the installer to replace the Lower Radiator Hose; (c) Bank 1, B Camshaft Position Timing Over-Advanced; (d) The tick sound coming from the Gen. III 5.0 engine (Id. p. 5).

57. On October 6th, 2020 Sheeder responded, "Well take care of it" (Id. p. 5).

58. On October 6th, 2020 Florer replied, "If, you have to take apart (disassemble) the New Reman. Engine, I want it replaced" (Id. p. 5).

59. On October 6th, 2020 Sheeder responded, "We do not have to do anything to your truck, take it to another dealer" (Id. p. 5).

60. On October 6th, 2020 Florer replied, "You are the installer, not another dealer" and therefore, Plaintiff refused to take it to another dealer (Id. p. 5).

61. On October 6th, 2020 Sheeder replied, "We are going to diagnose it and ask Ford what they want us to do" (Id. p. 5).

62. On October 6th, 2020 at about 8:30am Crabtree asked Florer to fill out a form under the middle section titled, "Client Concerns" and sign it at the X on the bottom section (Id. p. 5).

63. On October 6th, 2020 Florer noted at the Client Concerns section, DTC P0015, the tick, and the loose bracket, however, Florer read the bottom section of the form titled, "Statement of Disclaimer And Arbitration Agreement" and stated, "What is this, none of this information has been disclosed until now, I do not consent to arbitration," and refused to sign at the area designated by Crabtree (Id. p. 5).

64. That same day about 10:00am Sheeder stated that, "Ford wants us to replace a part in the engine, well need to schedule an appointment" (Id. p. 5).

65. That same day, Florer responded "replace the engine" (Id. p. 5).

66. That same day Sheeder replied, "No, but, you can make a formal request in writing to me. I am doing what Ford has told me to do" (Id. p. 5).

67. That same day Florer than asked for "the correspondence between LMC Ford and Ford" (Id. p. 5).

68. That same day Sheeder replied that "I do not have it yet, when I have it, I'll have Lisa (Crabtree) give it to you" (Id. p. 5).

69. That same day Florer drafted and provided a letter dated 10/6/20 to Sheeder per his request (Id. p. 5).

70. That same day about 5:00pm, Crabtree provided Florer with a document titled "Technical Support Request" (TSR) dated 10/06/20 (Id. p. 5).

71. On the TSR the LMC Ford Technician Dft Sanchez asked Dft FMC, "Now with this being a remanned engine do we tear it down to the point of failure or SWP (replace) the Long Block?" (Id. p. 6).

72. On the TSR Defendant FMC responded to Defendant Sanchez referencing the FMC "Warranty Policy Manual" reading in pertinent part, "if the engine long block was replaced within the last 30 days …the engine long block can be replaced again. If it has been more than 30 days since the engine long block has been replaced," repair it and the document included those repair instructions (Id. p. 6).

73. That same day, Florer than stated to Crabtree he meets the 30-day policy to replace the engine as he picked up the F150 on August 31st (2020) and the lower radiator hose came off on September 29th (2020) (Id. p. 6).

74. That same day Crabtree responded that, "It's been more than 30 days, you are a few days late, we did not diagnose it until October 2nd (2020) (Id. p. 6).

75. On October 7th, 2020 The consumer delivered the consumer product to the warranters (Id. p. 6).

76. On October 8th, 2020 Florer sent a letter via USPS to Defendant Sheeder stating the aforesaid facts and sent copies via USPS to Defendant's DeBoer and Farley Jr. requesting that the new engine be replaced (Id. p. 6).

77. On October 19th and 29th, 2020 Florer again asked LMC to address the issue of the tick noise coming from the new engine (Id. p. 6).

78. On October 29th, 2020 LMC Crabtree responded that "yes" the tick issue has been resolved (Id. p. 6).

79. On October 29th, 2020 Florer went to LMC Boise, meet the Ford Technician who installed the Reman Engine Defendant Sanchez, and whom just repaired the new engine by dissembling it. Florer noted that the tick sound is significantly louder after the repair (Id. p. 6).

80. On October 30th 2020 Crabtree claims that the Warranters resolution as to the new engine tick issue is that, "*We are going to locate a like vehicle with a like sound*" (Id. p. 6).

81. On October 30th, 2020 Florer asked LMC Crabtree for that vehicles:

"Vin. #; service records; repairs; miles; current and previous owners" (Id. p. 6).

82. On October 30th, 2020 Crabtree responded that, "*We are comparing and we cannot give you someone else records, information, etc. Once we find a vehicle to compare to I will let you know*" (Id. p. 6).

83. On November 2nd, 2020 Florer picked up the F150 from LMC Ford Boise after the new engine failure repair (Id. p. 6).

84. On March 7th, 2021 Florer was under the F150 looking at the starter because when the starter engaged it sounded abnormal, out of three (3) bolts that connect the starter to the engine block the bottom bolt was tight, the middle bolt was just sitting there not bolted, the top bolt was loose and backing out. Florer threaded in the middle bolt and tightened the middle and top bolts (Id. p. 7).

### C. SECOND OPPURTUNITY BY WARRANTERS

85. On June 24th, 2021 Florer noted that, the ongoing tick sound coming from the new engine had become significantly louder (Id. p. 7).

86. On July 1st, 2021 Florer noted that, a knocking sound had begun coming from the oil pan on cold starts at 23,652 miles on the new engine (Id. p. 7).

87. On July 9th, 2021 Florer contacted LMC due to: (a) the progressive ongoing tick, since installation has now become significantly louder and, (b) a knocking sound on cold starts coming from the oil pan (Id. p. 7).

88. On July 9th, 2021 Crabtree stated we need it for 2-3 days to diagnose it and made an appointment for July 26th to 28th, 2021. (Id. p. 7).

89. Thereafter, Crabtree changed the appointment to August 2nd to 6th, 2021 (Id. p. 7).

90. On July 25th, 2021 Florer wrote a letter to LMC stating the consumer complaints in Pgh. 87, above (Id. p. 7).

91. Florer, again, delivered the F150 to LMC Boise Ford on July 30th, 2021 (Id. p. 7).

92. On August 2nd, 2021 Crabtree asked Florer to come to the shop to meet the Ford Shop Foreman on the cold start oil pan knock (Id. p. 7).

93. On August 4th, 2021 Florer went to LMC Boise Ford and met Defendant's Spears (Ford Shop Foreman) and Sanchez (Ford installation/repair Tech.) (Id. p. 7).

94. On August 4th, 2021 Spears stated, "*Well compare to another vehicle for the tick*" and asserted that he hears no knocking on the cold start (Id. p. 7).

95. On August 4th, 2021 Florer stated that, "The tick can now be heard 20 feet away" and started the new engine, Spears and Florer went under the vehicle to the oil pan and Spears acknowledged the knocking from the oil pan on cold starts (Id. p. 7).

96. On August 4th, 2021 Spears stated that "Well figure it out, we need it for a few days" (Id. p. 7).

97. On August 4th, 2021 Spears asked Florer, "Have you changed the oil every 5,000 miles?" (Id. p. 7.

98. On August 4th, 2021 Florer responded "Yes" (Id. p. 7).

99. On August 4th, 2021 Spears asked Florer, "Do you have receipts?" (Id. p. 7).

100. On August 4th, 2021 Florer replied, "Yes" (Id. p. 7).

101. By August 18th, 2021 Florer had not been contacted by LMC Boise Ford, so Florer went to LMC and Spears stated that he "has been unable to diagnose it" (Id. p. 7).

102. On August 30th, 2021 Florer picked up the F150 from LMC Boise Ford, their contentions are that: (a) "There is no abnormal ticking noise" and (b) "can hear slight noise from rear of engine *compared to like vehicle and same noise*" on the Invoice #978499 dated August 26th, 2021 (Id. p. 7).

103. On August 30th, 2021 at LMC Boise Ford Florer started the new engine and noted the tick is now louder than when he delivered it to them on July 30th, 202 (Id. p. 8).

104. On August 30th, 2021 Florer drove the F150 from LMC directly to Oakley Moody Service Inc. (OMS), also in Boise and met Stan Keller (Owner), and parked the F150 so that we could cold start the new engine in the morning (Id. p. 8).

105. On the morning of August 31st, 2021 at OMS Florer noted the F150 had not been moved and cold started the Reman engine for Mr. Keller, whom stated "that sounds like a piston, it needs to be pulled out and measured, may be able to put a piston in it, or if the bore is off than the block needs replaced" (Id. p. 8).

106. On September 2nd, 2021 Florer phoned Crabtree and informed LMC Boise Ford that the tick has now become louder since you had the vehicle last (Id. p. 8).

107. On September 2nd, 2021 Crabtree responded, bring it in, we'll have the Shop Foreman look at, than well need to make an appointment (Id. p. 8).

108. On September 17th, 2021 Florer brought the F150 to OMS at 9am so that Mr. Keller could listen to the new engine at normal operating temperature, he made the same statement in Pgh. No. 105, above (Id. p. 8).

109. On September 17th, 2021 Florer went directly from OMS to LMC and at 10:00am met Defendants Spears and Stuart (Ford Shop Foreman's) as well as Crabtree and showed them their Invoice #978499 dated August 26th, 2021 that states, "could not duplicate abnormal ticking noise". Florer than started the new engine for them and then asked all three of them, "What is that ongoing ticking that has now developed into a knock since installation?" (Id. p. 8).

110. On September 17th, 2021 Dft's Spears and Stuart responded by plugging in their Ford Diagnostic Software to the F150's Powertrain Control Module, they played with the diagnostic software while whispering, smirking, and snickering than stated, "it could be air turbulence in the catalytic converter on the drivers' side, we need it back in the shop" (Id. p. 8).

111. On September 17th, 2021 Florer replied, "Put your con lines on paper" (Id. p. 8). They began to stutter and stammer and refused (Id).

112. On September 17th, 2021 Florer asked Stuart and Spears, "What does your diagnostic software tell you about the catalytic converters." (Id. p. 8).

113. On September 17th, 2021 Stuart responded, "There both (catalytic converters) working fine, no DTC's" (Id. p. 8).

114. On September 17th, 2021 Florer asked them, "So, if you get it in your shop, again, what are you going to do?" (Id. p. 8).

115. On September 17th, 2021 Stuart and Spears replied, "We don't know, well get in the shop and figure out something" (Id. p. 8).

116. On September 17th, 2021 Florer replied, "You just had it in your shop for a month and you have no logical remedy" (Id. p. 9).

117. On September 17th, 2021 both LMC Ford Spears and Stuart electronically "canceled out" each cylinder one at a time and while doing so the knock sound remained throughout each of the eight (8) cylinders being electronically canceled out one at a time. (Id. p. 9).

118. When Cylinders are electronically canceled out one at a time, the intake and exhaust valves to that cylinder close. Spark, fuel, air stop being delivered to that cylinder. However, the piston being attached by a rod and main bearings to the crank, continues to move up and down (Id. p. 9).

119. Since Florer purchased the F150 with the original 2013 Gen. I 5.0 Coyote engine and since the installation of the new 2020 Gen. III Coyote engine Florer has used the F150 for personal normal use and has changed the oil and filter every 5,000 miles (Id. p. 9).

120. Dft's Warranters Ford Motor Service Co. and Lithia Motors Corporation have failed to conform to their Written-Warranty and/or Limited-Warranty and/or Express-Warranty (Id.).

121. By 23,652 miles on the new engine the ongoing tick sound since installation has progressed into a knock sound and the cold start knock from the oil pan continues for 5 minutes or longer until the engine reaches normal operating temperature (Id. p. 9).

122. On __10/26/22__ ,2022 Florer's F150 odometer shows __235,370.8__ miles (Id. p. 9). This case is filed within the warranters warranty periods.

## IV. CLAIMS

### 1. ARBITRATION IS NOT APPLICABLE

Being that the Warranter's FMC and LMC intentionally failed to disclose to the Consumer pre-sale and sale that if any dispute arises as to:

(a) The Manufacturer/Supplier FMC defect and/or failure in the nature of the material and/or workmanship in the manufacturing of its Reman engines by an ongoing progressive engine piston knock since installation;

(b) Seller/Installer LMC's defect and/or failure in the nature of the material and/or workmanship by failing to replace the lower radiator hose that caused engine failure and several malfunctions in the Consumer Product, as well as refusing to remedy the ongoing progressive engine piston knock since the installation;

that the Consumer is bound to Arbitrate.

The Defendant's failed to disclose arbitration to the Consumer until the Plaintiff made a complaint to the Warranter's/Manufacture's/Supplier's/Seller's/Installer twenty-eight (28) days after the installation and more than sixty days (60) after the sale of the Consumer Product, did the Defendant's produce a document titled Initial Customer Contact and ask the Plaintiff to sign under Statement of Disclaimer and Arbitration Agreement.

Defendant's actions and inactions are in violation of 15 U.S.C. Ch. 50 Sec. 2302(a),(b); Title 16 C.F.R. Vol. 1, Sub. Sec. G, Part's 702.2; 702.3(a)(1),(2).

Furthermore, the Defendants have also failed to provide the Consumer with a Mechanism to arbitrate. In violation of 15 U.S.C. Ch. 50 Sec. 2310; Title 16 C.F.R. Vol. 1, Sub. Sec. G, Part's 703.1(e); 703.2(b)(1)-(4); 703.2(c).

The Plaintiff's Prayer For Relief on this claim is that, had the Defendant's disclosed there Statement of Disclaimer and Arbitration Agreement Pre-sale and/or Sale, Pltf would not have transacted any business with the Defendant's, as such, the Plaintiff demands a full refund absent any deprecation and Incidental/Consequential/Compensatory/Punitive/Statutory/Other applicable damages in the amount of $100,000.00. And Declaratory Relief pursuant to Title 28 U.S.C. Sec. 2201 that, due to Defendant's aforesaid failures, Arbitration is not applicable here.

## 2. MANUFACTURER DEFECT

The new engine has a FMC manufacturer defect in the nature of the material and/or workmanship. Since the installation a slight tick sound that, at 23,652 miles on the new engine, the ongoing tick sound has progressed into a piston knock and/or the long block bore is off.

The noise inandof itself is indicative of internal structural problems. Being that the Defendant Warranters have had two (2) separate occasions to remedy the factory materials and/or workmanship defect for thirty (30) days each. And being that Defendant Warranters concede that there is not a sound basis in remedy for a third remedial attempt by them, it is now the Consumer's Choice of remedy pursuant to Title 15 U.S.C. Ch. 50 Sec. 2304(a)(4); Idaho Code Title 48 Ch. 9, Sec. 903 (1), (2), (5)-(7).

By attempting to repair under warranty on two (2) separate occasions , and by using undisclosed warranty terms *"compare to like vehicle same noise" and "no abnormal noise"* the Defendant's FMC/LMC admit to the defective nature of material and/or workmanship of the new engine and such terms are not part of the bargain. The basis of the bargain relied upon is that the new Reman engine will be replaced under the circumstances here. When Defendant's failed to correct the defects in the material and/or workmanship of the Reman engine, they breached the terms of their Written/Limited/Express Warranty's. As well as violating I.C. Title 48 Ch 6 Sec. 603 (17),(18), 603C (1),(2)(c),(d).

Plaintiff's Prayer For Relief on this claim is replacement of the Reman engine absent any deprecation and Dft Warranters Written/Limited/Express Warranty begins a new as well as Incidental/Consequential/Compensatory/Punitive/Statutory/Other applicable damages in the amount of $100,000.00.

### 3. FAILRE TO DISCLOSE WARRANTY TERMS

Only after Pre-sale and Sale of the warranted consumer product have Defendant Warranters disclosed their Written-Warranty/Limited-Warranty/Express-Warranty terms *"compare to like vehicle same noise" and "no abnormal noise"*, thus, a misrepresentation to the Consumer because the aforesaid terms constitute an actual Warranty and are not part of the bargain.

Had these terms been disclosed Pre-sale/sale, the Plaintiff would not have transacted business with the Defendants, nor would the Plaintiff had done so had the Defendants disclosed that *"abnormal noise"* is not covered by their Reman Engine Warranty.

These action/inactions by the Defendants have breached the terms of their Warranty. Said terms are required to be disclosed fully and conspicuously in simple and readily understood language pursuant to Title 15 U.S.C. Ch. 50, Sec. 2302(a)(4),(6) and Sec. 2302(b)(1)(A); Title 16 CFR Vol. 1, Sub. Sec. G, Part 701.3(2),(3) and Part 702.2, 702.3(a)(1)-(2), (b); The Defendants actions/inactions are unconscionable, misleading, false, and deceptive in violation of Idaho Code Title 48 Ch. 6, Sec. 603(17)-(18), 603C.

Plaintiffs Prayer For Relief on this claim is a refund of the purchase price against each Dft Warranter and Incidental/Consequential/Compensatory/Punitive/Statutory/Other applicable Damages in the amount of 100,000.00 and Declaratory Relief pursuant to Title 28 U.S.C. Sec. 2201 that, the aforesaid terms used by Defendant Warranters are part of their Warranty and must be disclosed Pre-sale/sale.

### 4. DFT'S WARRANTY IS UNILATERAL

The Defendant's warranty allows them alone to determine, (a) what is a defect, and (b) what is not a defect, in violation of 15 USC 2302(a)(1)-(13); Title 16 CFR Vol. 1, Sub. Sec. G, Part 700, Sub. Part 700.8. And unconscionable, misleading, false, and deceptive in violation of I.C. Title 48 Ch. 6, Sec. 603 (17),(18) and Sec. 603C.

Pltf Prayer For Relief on this claim is a refund of the purchase price against each Defendant Warranter and Incidental/Consequential/Compensatory/Punitive/Statutory/Other applicable

Damages in the amount of 100,000.00 and Declaratory Relief pursuant to Title 28 U.S.C. Sec. 2201 that, the Defendants cannot unilaterally determine what is and what is not a defect.

### 5. DFT'S WARRANTY IS A FULL WRITTEN-WARRANTY

Defendant FMC's written affirmation of fact or written promise made in connection with the sale of the consumer product is that, the Reman engine is warranted for "Three (3) years unlimited miles" and Defendant LMC written affirmation of fact or written promise is that, the Reman engine is warranted for "Three (3) years or 50,000.00 miles whichever occurs first" meets the Statutory Definition of "Full Written-Warranty". 15 U.S.C. Ch. 50 Sec. 15 U.S.C. 2301(6) and 2303(a)(1); 16 C.F.R. Vol. 1, Sub. Sec. G, Part 700.3(a).

Pltf Prayer For Relief on this claim is Declaratory Relief pursuant to Title 28 U.S.C Sec. 2201 that, Defendants Written-Warranty be conspicuously designated as a "Full Written-Warranty".

### 6. INSTALLER WORKMANSHIP DEFECT

The Seller/Installer LMC, trained in materials and workmanship by FMC, failed in the nature of the material and/or workmanship during the removal/installation of the Reman engine by only replacing the upper radiator hose and not the Lower Radiator Hose, that at 2,400 miles and/or twenty-eight (28) days since the installation "broke" according to LMC. Thus, causing engine failure as well as causing the Reman three (3) malfunctions. DTC's 1285 Cylinder head Over-temperature; 1299 Limp Mode; P0015 Bank 1 Camshaft Over-advanced. Therefore, a defect by the Installer as to the nature of the material and/or workmanship.

LMC's intentional actions/inactions of claiming that, "Take it to another dealer" "We cannot look at for a couple weeks" and instructing the Pltf on how apply the "Sheeder Fix" to the lower radiator hose were steps taken to misrepresent the Warranters Warranty and stall/mislead the Consumer beyond the Warranter's Policy Manuel that reads in pertinent part, "if the engine long block was replaced within the last 30 days…the engine long block can be replaced again. If it has been more than 30 days since the engine long block has been replaced" than repair.

The Defendant's elected repair over replacement within the first 30 days of installation of the Reman engine, these actions by Defendants are not part of the bargain, thus, the Defendant's breached the terms of their Warranty.

The Defendants intentional actions/inactions also violate Idaho Code Title 48 Ch. 9, Sec. 903; Idaho Code Title 48 Ch. 603(17)-(18), 603C as unconscionable, misleading, false, and deceptive.

Had this required warranty information been disclosed pursuant to 15 U.S.C. 2304(a)(4) that the Warranter's will disassemble a brand-new consumer product Generation III Reman. engine that had engine failure as well as malfunctioned within the first 30 days, or said another way, before the first required oil/filter change at 5,000 miles, the Consumer would not have transacted any business with the Defendant's.

The basis of the bargain relied upon is that the Reman will be replaced under the circumstances. It is now Consumer Choice of Remedy Pursuant to 15 U.S.C. Ch. 50 Sec. 2304(a)(4); Idaho Code Title 48 Ch. 9, Sec. 903 (1), (2), (5)-(7).

Plaintiff's Prayer For Relief on this claim is a Refund of the purchase price against Defendant Warranter FMC; and a replacement of the Reman engine by LMC absent any deprecation and Incidental/Consequential/Compensatory/Punitive/Statutory/Other applicable damages in the amount of 100,000.00 against each Defendant Warranter; and Declaratory Relief pursuant to Title 28 U.S.C. 2201 that, said warranty terms must be disclosed Pre-sale/sale.

I, Scott Florer, certify that the aforegoing is in compliance with F.R.C.P. Rule 11(b).

Date: 10/26/22

Print: Scott Florer

Sign: S Florer

complaint    19 of 19